# EXHIBIT A

Andrew D. Wright, #8857
STRONG & HANNI
9350 South 150 East, Suite 820
Sandy, Utah 84070
Telephone:  (801) 532-7080
Facsimile:   (801) 596-1508
*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT OF SALT LAKE COUNTY

## STATE OF UTAH

---

| | | |
|---|---|---|
| PRIME INSURANCE COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT FOR** |
| | ) | **DECLARATORY RELIEF** |
| v. | ) | |
| | ) | **Tier II** |
| JUUL LABS, INC. | ) | |
| | ) | |
| Defendant. | ) | Case No.: |
| | ) | |
| | ) | Judge |

---

Plaintiff Prime Insurance Company ("Prime"), by and though counsel, hereby complains and alleges against JUUL Labs, Inc. ("JUUL") as follows:

### PARTIES

1.   Prime is an insurance company incorporated under the laws of the State of Illinois, with its principal place of business in Utah.

2.   Defendant JUUL is a Delaware company with its principle place of business in San Francisco, California.

## JURISDICTION

3.    Jurisdiction and venue are proper in this Court and County pursuant to Utah Code Annotated Sections 78B-3-304, 78B-6-401, and 78B-3-307.

4.    Prime issued an Excess Liability Policy to JUUL in the form of Policy No. SC18121397, with coverage effective dates of August 14, 2018 through July 1, 2019, with a retroactive date of August 14, 2018 ("the Policy"). (*See* Policy, attached hereto as Ex. 1).

5.    Pursuant to the plain terms of the Policy, Prime and JUUL have contractually agreed to submit to jurisdiction and venue in any court within the State of Utah and have agreed that Utah law will be applied.

6.    Specifically, the Policy includes the following provisions related to jurisdiction:

### SECTION X—GOVERNING LAW

This Agreement is entered into in the State of Utah and the Agreement, and any rights, remedies, or obligations provided for in this Agreement, shall be construed and enforced in accordance with the laws of Utah.

### SECTION XII — CONSENT TO EXCLUSIVE JURISDICTION

The Insured understands and acknowledges that the Insurer conducts its business activities, including underwriting, risk management and claims services within the State of Utah. The Insured represents and acknowledges that the Insured has purposefully directed its actions to procure the insurance services of the Insurer within the State of Utah and, for that purpose, will make continuous and systematic requests for the Insurer's services in the State of Utah. The Insured acknowledges that, by entering into this policy of insurance, the Insured is deemed to be transacting business within the State of Utah such that the courts of Utah may exercise jurisdiction over it regarding any issues arising out of this Policy. In addition, the Insured hereby understands and consents to the jurisdiction of the courts in the State of Utah and agrees that those courts shall be the exclusive forum for the resolution of any claims or disputes arising between the parties related to any insurance coverage issues and any payments due the Insured under the Policy, unless both the Insurer and Insured agree otherwise in writing.

7.   By entering into the Policy, JUUL acknowledged that Prime conducted its activities within the State of Utah and transacts its primary business operations within the State of Utah.

8.   With that understanding, JUUL purposefully directed its actions to procure services within the State of Utah and made continuous and systematic requests for services within the State of Utah.

## GENERAL FACTUAL ALLEGATIONS

9.   Plaintiff incorporates each of the allegations set forth above as though fully set forth herein.

10.   Prime is an excess and surplus lines insurer which issues various forms of customized, or manuscript, insurance policies throughout the United States.

11.   JUUL manufactures e-cigarettes that use a cartridge, or pod, containing oil that can be heated into a vapor and inhaled.

12.   Over the years, JUUL has obtained a substantial market presence, by some estimates, as much as 70% of the e-cigarette business in the United States.

13.   JUUL, through its insurance broker RT Specialty, first approached Prime in July of 2018 asking that Prime consider issuing excess liability coverage to JUUL.

14.   At that time, JUUL submitted an application in which it was asked if it had "any claims in the last 5 years."  JUUL responded "yes."

15.   In support of its response, JUUL submitted Loss Runs showing several prior claims that had been made against the company.

16.   The Loss Runs did not show any claims made against JUUL in 2018.

17.   JUUL also submitted an industry-standard Acord Application, signed by its broker.

18.  The Acord Application asked JUUL to disclose any "claims or losses (regardless of fault and whether or not insured) or occurrences that may give rise to claims."

19.  The Acord Application does not disclose any such claims, losses or occurrences.

20.  As negotiations between Prime and JUUL continued, JUUL's broker indicated that "[JUUL] have not had any product claims."

21.  On August 3, 2018, Prime issued an initial quote for insurance, however, that quote was not accepted by JUUL.

22.  On August 10, 2018, Prime issued a revised quote which again was not accepted by JUUL.

23.   In November of 2018, JUUL through its brokers, asked Prime to quote a different layer of excess liability coverage.

24.  Prime issued a quote for excess liability coverage of $5,000,000 in excess of $60,000,000 in underlying coverage on December 17, 2018.

25.  On December 18, 2018, Prime learned that there may be existing or threatened class action litigation against JUUL arising out of its manufacturing and distribution of flavored e-cigarette pods that were alleged to be marketed and sold to children.  Such litigation alleged that some of the flavors manufactured by JUUL such as mango, fruit medley and crème brulee were especially attractive to youth.

26.  Upon learning this information, Prime withdrew its December 18, 2018 quote.

27.  On December 19, 2018, Prime had a conference call with JUUL and its brokers.  At that time, JUUL represented to Prime that it had pulled the flavored e-cigarette pods from the market and that they were no longer being sold.

4

28.   JUUL also represented to Prime that it had no known pending claims, losses or occurrences that would fall within the anticipated August 14, 2018 through July 1, 2019 policy period.

29.   Based on these representations, Prime reinstated its December 17, 2018 quote.

30.   As Prime was working to bind the Policy, Prime asked JUUL to submit forms to again confirm there were no known claims, losses or occurrences that could lead to a claim within the policy period.

31.   A Coverage Request Form signed by JUUL and its broker cautioned JUUL about its duties to disclose material facts to Prime.

32.   Similarly, a Claims Warranty and Coverage Statement signed by JUUL and its broker indicated that the prior application documents and other supplemental information submitted by JUUL was true and correct and inclusive of all material information, and would be relied upon by Prime.

33.   JUUL and its broker also signed a form requesting disclosure of information about any known claims or lawsuits.  JUUL and its broker did not identify any claims or lawsuits.

34.   On December 21, 2018, JUUL also signed and submitted a Claims History and Incident Disclosure History form asking JUUL to identify any known claims, losses or occurrences that could lead to a claim.  JUUL did not disclose any claims, losses or occurrences in the form.

35.   As Prime was processing the documents submitted by JUUL and its broker, Prime noted that JUUL had not answered one of the questions in the Claims History and Incident Disclosure History form regarding potential claims.  As such, Prime sent the form back to JUUL's broker to be completed.

36.  JUUL and its broker then sent a revised form which included a response to the following question: Are you aware of any prior incident, event, or occurrence that might reasonably be expected to lead to a claim, lawsuit, notice of loss, or loss?"  JUUL answered "No" in response to this question.

37.  JUUL also submitted updated loss runs which identified several prior claims and lawsuit involving incidents that occurred prior to the Policy's inception and retroactive date of August 14, 2018 – which would therefore not be covered by the Policy.

38.  Based on the information submitted, Prime then issued the Policy to JUUL.

39.  Despite the above-representations, Prime has recently been informed by JUUL that, while it is no longer manufacturing flavored e-cigarette pods, such pods are still being sold in various places throughout the United States to this day.

40.  Moreover, despite the representations that the flavored products had been removed from the market, JUUL recently informed Prime that it was continuing to directly sell the flavored e-cigarette pods online.

41.  In fact, Prime has now learned that the ongoing sale of flavored e-cigarette pods has resulted in the filing of several class action lawsuits, and other litigation, in various parts of the country.  These claims were not reported to Prime in the binding process or since.

42.  Despite representations to the contrary as outlined above, Prime has information and belief that JUUL knew of some or all of the pending lawsuits involving the manufacturing and sale of flavored e-cigarette pods and did not disclose the same to Prime.

43.  Accordingly, Prime has notified JUUL of the failure to disclose material information, and the apparent misrepresentations during the binding process.

44.   Prime has returned all premium paid by JUUL for the Policy.

## CLAIM FOR DECLARATORY RELIEF

## COUNT I: RESCISSION OF THE POLICY

45.   Prime incorporates each of the allegations set forth above as though fully set forth herein.

46.   An actual dispute and controversy has arisen between Prime and JUUL regarding whether there is a basis to rescind or otherwise cancel the Policy.

47.   Prime has the right to rescind the Policy because JUUL either intentionally misrepresented or failed to disclose material information regarding its operations.

48.   Specifically, JUUL represented to Prime that its flavored e-cigarette pods were no longer being sold in the United States and that the exposure that existed from prior lawsuits was no longer a concern.

49.   JUUL has now informed Prime that the flavored e-cigarette pods are in fact continuing to be sold in various parts of the country to this day, including without limitation, by way of direct sales by JUUL online.

50.   This information is material to Prime as it would not have issued the Policy had it known JUUL's flavored e-cigarette pods were continuing to be sold and that JUUL had potential ongoing exposure arising from the same, as had been demonstrated in prior litigation.

51.   In addition, on information and belief, JUUL knew that several claims and suits had been filed against JUUL involving JUUL's flavored e-cigarette pods and other products which were not disclosed to Prime when the Policy was bound and issued.

52. The information regarding the pending claims and suits against JUUL is material to Prime as it would not have issued the Policy had it known of such information.

53. Accordingly, pursuant to Utah law and the terms of the Policy, the Court should issue a declaration that the Policy is rescinded and that Prime has no insuring obligations to JUUL.

## COUNT II: ALTERNATIVE CANCELLATION OF THE POLICY

54. Prime incorporates each of the allegations set forth above as though fully set forth herein.

55. The Policy allows Prime to cancel the Policy for any reason, with notice to JUUL.

56. In the event the Court determines the Policy cannot be rescinded, Prime seeks, in the alternative, a declaration that the Policy is cancelled pursuant to the terms and conditions set forth in the Policy as there has been a material change in JUUL's operations as initially represented by JUUL and its broker.

57. The material change in JUUL's operations, from what was represented to Prime, include the fact that JUUL's flavored e-cigarette pods are continuing to be sold in various places throughout the country to this day, and the fact that JUUL had pending litigation that was not disclosed to Prime.

58. Accordingly, Prime seeks, in the alternative, that the Court issue a declaration that the Policy is cancelled in light of the change in operations as represented by JUUL to Prime.

**COUNT III:  THERE IS NO COVERAGE AVAILABLE FOR CLAIMS INVOLVING OCCURRENCES PRIOR TO THE POLICY PERIOD, OR FOR CLAIMS WHICH DO NOT OTHERWISE MEET THE TERMS AND CONDITIONS OF THE APPLICABLE POLICIES**

59.  Prime incorporates each of the allegations set forth above as though fully set forth herein.

60.  Prime's Policy is an excess liability following-form policy, which means that it incorporates the terms and conditions of an underlying primary policy.

61.  The Prime Policy identifies Endurance Specialty Insurance, Ltd. Policy number EXC10013602700 as the underlying primary policy which is incorporated into Prime's Policy (the "Endurance Policy.")

62.  The Endurance Policy, and therefore Prime's Policy, provides coverage for claims which are made and reported during the policy period that arise from incidents that occur during the policy period.

63.  The Endurance Policy, and therefore the Prime Policy, specifically excludes claims arising from incidents which occurred prior to the policy period as follows:

## IV - EXCLUSIONS

This Policy does not apply to actual or alleged:

**A.      PRIOR TO INCEPTION OR RETROACTIVE COVERAGE DATE**

**Personal Injury** to any individual person, **Property Damage** to any specific property or **Advertising Liability** which takes place prior to the **Inception Date** or, if applicable, the **Retroactive Coverage Date**.

64.   The inception date and retroactive coverage date in the Endurance Policy are the same as in the Prime Policy, August 14, 2018.

65.   Accordingly, the Court should enter a declaration that there is no coverage available for any claims recently reported by JUUL to Prime which arise from incidents which occurred prior to the inception date of the Prime Policy.

66.   In addition, the Court should enter a declaration that there is no coverage for any claims recently reported by JUUL that do not meet all of the terms and conditions of the Endurance Policy and the Prime Policy, or which are otherwise excluded by the polices.

## PRAYER FOR RELIEF

In light of the above, a judicial determination is necessary and appropriate at this time to determine the respective rights of Plaintiff and Defendant under the Policy.  Pursuant to Utah Code Ann. § 78B-6-408, Plaintiff requests a declaration from this Court that

a. The Policy issued by Prime is rescinded based on material misrepresentations and failure to disclose on the part of JUUL.

b. Alternatively, Prime has the right to cancel the Policy based on the fact that JUUL's flavored e-cigarette pods are continuing to be sold in various parts of the country to this day, and based upon claims JUUL failed to report to Prime.

c.  There is no coverage for any claims which involve incidents that occurred prior to the inception date of the Prime Policy or which do not otherwise meet the terms and conditions of the Endurance Policy and the Prime Policy.

DATED this 30th day of May, 2018.

STRONG & HANNI

By____/S/ Andrew D. Wright_____
    Andrew D. Wright
    Jason L. DeForest
    *Attorneys for Plaintiff*

Plaintiff's address:
PRIME INSURANCE COMPANY
c/o CLAIMS DIRECT ACCESS
8722 South 300 West
PO Box 4439
Sandy, Utah 84091

# Exhibit 1



# Prime Insurance Company
## Declarations
### Page 1 of 2

THIS INSURANCE POLICY (the "Policy") is being issued by an Insurer that may not be licensed by the state insurance department in this state and may not be subject to this state's supervision and may not be protected in the event of the insolvency of the insurer by this state's guaranty or security fund. This Policy issued may not be subject to any or all of the regulations of this state's insurance department pertaining to Policy form.

| Policy Number:  SC18121397 | Customer Number:  C18-108139 |
|---|---|

**Policy Period:** From Effective Date:  8/14/2018   To Expiration Date:  7/1/2019   Retroactive Date:  8/14/2018
(All dates (12:01 a.m.) of the physical address of the Insured.)

| Name and Physical Address of the Insured: | Mailing Address: |
|---|---|
| Juul Labs Inc | 560 20th St, Bldg 104 |
| 660 Alabama St Fl 2 | San Francisco, CA 94107 |
| San Francisco, CA 94110 | |

**Policy Premium:**

| | |
|---|---|
| Premium: | $320,950.00 |
| Insurer Inspection/Policy Fee: | $350.00 |
| Surplus Lines Broker Fee | $0.00 |
| State Tax: | $9,639.00 |
| SLSC: | $642.60 |
| **Total:** | **$331,581.60** |

100 % Premium Earned at Inception

Description of coverage afforded hereunder:   Excess Liability - Claims Made

Endorsements and forms afforded to this policy:   FFEL-00-01, PCL-99-31, PAP-99-06 , PAP-99-16

**Producer:** R-T Specialty, LLC
180 N Stetson Ave, Ste 4600
Chicago, IL 60601

Contact: R T Specialty LLC
License No: 0G97516

**Issuing Office:** Prime Insurance Company
8722 S. Harrison St.
Sandy, UT 84070

**Address Notice of Claims to:** Claims Direct Access (CDA)
8722 S. Harrison St.
Sandy, UT 84070



# Prime Insurance Company
## Declarations
### Page 2 of 2

| Excess Liability: | | | | Line Premium: $320,950 | |
|---|---|---|---|---|---|
| $5,000,000 | Aggregate | | | | |
| $10,000 | SIR-BI | | | | |
| $10,000 | SIR-PD | | | | |
| Products: | ☑ Include | ☐ Exclude | | | |
| Completed Ops: | ☑ Include | ☐ Exclude | | | |
| Form Type: | ☑ Claims Made | ☐ Occurrence | | | |

**Limitations:** The Policy provides coverage for only those activities and operations otherwise covered under the Policy as listed below and for which a specific coverage charge has been paid.

| Classification and Description of activities and operations | Code No. | Basis of Coverage Charge |
|---|---|---|
| Excess Liability - Manufacturer of E-Cigs, vapors, liquids and hardware/components | 49995 | Minimum Premium |

| Loc.No. | Address |
|---|---|
| 1 | 660 Alabama St, 2nd Fl. San Francisco, CA 94110 |

| Insured Name: | Juul Labs Inc | |
|---|---|---|
| Issuing Date: | 1/9/2019 | *Michael Fennell* |
| | | Authorized Representative |

"This insurance policy is being issued by an insurer that may not be licensed by the state insurance department in this state and may not be subject to this state's supervision and may not be protected in the event of the insolvency of the insurer by this state's guaranty or security fund. This policy issued may not be subject to any or all of the regulations of this state's insurance department pertaining to policy form."

**THIS INSURANCE CONTRACT IS REGISTERED AND DELIVERED AS A SURPLUS LINES POLICY UNDER THE SURPLUS LINE LAWS IN THE STATE WHERE THE NAMED INSURED IS LOCATED. THE INSURANCE IS NOT ISSUED BY AN INSURANCE COMPANY REGULATED BY THE STATE WHERE THE INSURANCE IS ISSUED AND IS NOT PROTECTED BY ANY STATE INSURANCE GUARANTEE FUND.**

## SERVICE OF SUIT ENDORSEMENT

### PAP-99-06

**This Endorsement changes the terms and conditions of the Policy issued.  Please read it carefully!**

Pursuant to a statute of any state of the United States which makes provision therefore, Prime Insurance Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for the purpose in the statute, as its true and lawful attorney for the purpose of accepting service of process of any suit instituted by or on behalf of the Insured.

This Endorsement applies solely to service of process and does not modify any forum selection or choice of law provisions contained in the Policy.

## EXCESS LIABILITY POLICY (FOLLOW FORM)

### FFEL-00-01

THIS CLAIMS MADE AND REPORTED EXCESS LIABILITY POLICY (the "Policy") is a manuscript policy, meaning it is a negotiated agreement between the Insured and the Insurer, and as such it may differ significantly from excess liability policies offered by other insurance companies. As a claims made and reported excess insurance policy, this Policy contains very strict reporting requirements which must be followed as conditions precedent to coverage. The terms of this Policy are contractual and are not merely recitals and all information supplied by any Insured to obtain coverage, constitute warranties of the Insured to the Insurer.

Coverage is provided only for otherwise covered Claims which meet all of the following requirements:

    (1) Which result in an Ultimate Net Loss for the Insured in excess of the Primary Insurance, and

    (2) Which are first made against an Insured during the Policy Period, and

    (3) For which written notice is given to the Company during the Policy Period in accordance with the specific informational and timeliness requirements specified in the Policy, and

    (4) For which written notice is given to the Primary Insurer during the Policy Period in accordance with the specific informational and timeliness requirements specified in the Primary Insurance policy.

Various other provisions of this Policy restrict and limit the coverage provided. Please read the entire Policy and all Endorsements carefully to determine your rights and duties and what is and is not covered.

Claim Expenses reduce the available Limits of Liability stated on the Declarations. In the event of any Claim, the total amount of any Policy premium charged is 100% earned and not subject to short-rate or pro-rata adjustment.

Throughout the Policy and any Endorsements, the words "you," "your," "Insured" and "Named Insured" refer to the Insured. The words "we," "us," "our," and the "Company" refer to the Insurer.

Capitalized terms have specific meaning throughout the Policy as defined in the Definitions Section below.

### SECTION I – COVERAGE

A.  Insuring agreement

    1.  Subject to all of the terms, limitations, conditions, definitions, exclusions and other provisions of this Policy, we shall indemnify the Insured for Ultimate Net Loss in excess of the Primary Insurance which results from Claims made against the Insured and reported to the Company and the Primary Insurer during the Policy Period.

    2.  Coverage under this Policy shall be effective only after the limit of liability of the Primary Insurance has been reduced or exhausted by the actual payment of Ultimate Net Loss to which this Policy applies.

    3.  Except as provided herein, coverage under this Policy shall apply in conformity with and subject to the warranties, limitations, conditions, provisions, and other terms of the Primary Insurance.

4.   This Policy shall not be broader than coverage provided by the Primary Insurance.

## SECTION II – NO DUTY TO DEFEND OR SETTLE

The Insured has the sole responsibility for the investigation, settlement, defense and final disposition of any Claim or suit brought to which this Policy applies. The Insured shall settle all Claim(s) or suits which reasonably should be settled provided, however, that the Insured shall not make or agree to any settlement for any sum involving the Primary Insurance or this Policy without the Company's written consent.  The Company may at its sole discretion elect to participate in the investigation, settlement, or defense of any Claim or suit covered by this Policy which in the Company's opinion involves or appears to involve coverage under this Policy, even if the Primary Insurance has not been exhausted. If the Company elects to so participate, the Insured shall fully cooperate with the Company. The duty of the Insured to cooperate with the Company is a condition precedent to coverage under this Policy and the Insured's failure to cooperate shall relieve the Company of its liability.

It is agreed that all Claim Expenses incurred by the insured or by the Company on behalf of the Insured shall be applied against the Limit of Liability shown on the Declarations.

## SECTION III – WHO IS AN INSURED?

An Insured is the person or entity expressly designated on the Declarations as an Insured and also as defined by the Primary Insurance.

## SECTION IV – LIMITS OF LIABILITY

A.   The Company's Limit of Liability is the most the Company will pay as Ultimate Net Loss in excess of the Primary Insurance for any Claim first made and reported during the Policy Period.

B.   The Company's Limit of Liability shall attach only in the event of the reduction or exhaustion of the limit of liability of the Primary Insurance as a result of the actual payment of Ultimate Net Loss covered thereunder:
   1.   In the event of such reduction, we shall pay excess of the reduced limit of liability of the Primary Insurance; and
   2.   In the event of such exhaustion, the Policy shall continue in force as primary insurance excess of any Self-Insured Retention ("SIR") or deductible in the Primary Insurance, and such SIR or deductible shall be applied to any subsequent loss as specified in the Primary Insurance.

C.   The Company's Limit of Liability is the amount designated on the Declarations for all Claim(s) first made and reported to the Company during the Policy Period, regardless of the number of:  Insured(s); Claim(s) made or suits brought; or person or organizations making Claim(s) or bringing suits.

D.   This Policy shall drop down only in the event of reduction or exhaustion of the Primary Insurance by the actual payment of Ultimate Net Loss and shall not drop down for any other reason including, but not limited to the uncollectibility (in whole or in part) of the Primary Insurance. The risk of uncollectibility of the Primary Insurance, whether due to financial impairment or insolvency of the Primary Insurer or for any other reason, is expressly retained by the Insured and is not in any way assumed by the Company.

E.   This Policy has been issued to the Insured in response to a request for coverage from the Insured, and its retained broker, if applicable. Various optional insurance has been offered to Insured by Insurer, including different types of insurance and different limits of liability, and Insured and its broker have expressly selected the type and amount of coverage desired. As such, Insured, and its retained broker if applicable, are solely responsible for determining the type and amount of insurance needed for Insured's operations and the amount of

insurance required by any federal or local laws which may apply to Insured's specific operations. In no event shall Insurer be responsible for determining the type and amount of insurance required by federal or local laws which may apply to Insured's specific operations, and Insurer makes no warranty that this Policy complies with all laws that may apply to Insured's various business operations. In the event any court, arbitrator or regulatory agency reforms or revises this Policy to comply with laws applicable to the type or amount of insurance required by Insured's specific operations, Insured and its broker shall indemnify and hold Insurer harmless from any increased limit of liability or other exposure created by such reformation or revision, including attorney fees and costs arising therefrom.

### SECTION V – MAINTENANCE OF PRIMARY INSURANCE AND UNIMPAIRED PRIMARY LIMITS

A.  It is agreed that the Insured shall maintain the Primary Insurance as was in full force and effect when applying for coverage under this Policy.  The Primary Insurance must remain in full force and effect except for reduction of such limits by payment of Claim(s) to which this Policy applies.  However, failure to maintain the Primary Insurance in full force and effect will not invalidate this Policy but in the event of such failure, the Company shall only be liable to the same extent as it would have been had the Insured complied with this condition.

B.  The Insured shall furnish the Company with a copy of the Primary Insurance.

C.  The Insured must immediately notify the Company in writing, to the address designated in Section VII, A., 1. herein, of any change in the Primary Insurance. Any change not reported to and approved by the Company will not be covered by this Policy.

D.  The Named Insured shall furnish the Company copies of the Primary Insurance policy changes. If there is an increase in risk and/or premium of the Primary Insurance, than the premium for this Policy may be adjusted.  For the purpose of determining the attachment of this Policy, the limits of the Primary Insurance will not be reduced or exhausted by reason of any liability paid thereunder for Claim(s) not covered under this Policy or any endorsement hereto.

### SECTION VI – INCORPORATION OF PRIMARY INSURANCE POLICY TERMS

This Policy is subject to the warranties, definitions, exclusions, terms, and conditions of the Primary Insurance policy except as otherwise expressly stated in this Policy.

### SECTION VII – REPORT OF CLAIMS

The Insured shall, as a condition precedent to coverage under this Policy, provide the Company written notice of a Claim or any situation that could give rise to a Claim under this Policy regardless of the terms and conditions of the Primary Insurance.

A.  Notice of Accident, Potential Claim, Claim, or Suit

1.  As an express condition precedent to coverage under this Policy, you must give us immediate written notice, as soon as possible and in no event later than 72 hours, of any incident, event, occurrence, loss, or Accident which might give rise to a Claim covered by this Policy.  Written notice must be given to: Claims Direct Access, P.O. Box 4439, Sandy, Utah 84091-4439, U.S.A.  Phone: (877) 585-2849 or (801) 304-5530; Fax: (877) 452-6909 or (801) 304-5536, and include:

a.  How, when, and where the incident, event, occurrence, loss, or Accident took place;

b.  The names and addresses of any injured persons and witnesses; and

    c.   The nature and location of any injury or damage arising out of the Accident.

In addition, as a condition precedent to coverage, you must preserve any evidence relating to the incident, event, occurrence, loss, or accident, including but not limited to: any documentation required by this Policy; contracts, receipts or related documentation; video or audio surveillance; incident reports; witness statements and photographs.

2.   You and any other involved Insured must:

    a.   Immediately or at the earliest practicable moment, and in no event later than 10 days after receipt by you, send us copies of any demands, notices, summonses, or legal papers received in connection with any Claim or Suit and act in all diligence and prudence to resolve the Claim or Suit; provided, however, that no settlement in excess of any applicable SIR or the limit of liability of the Primary Insurance will be agreed to by the Insured without the Company's express written consent;

    b.   Authorize us to obtain records and other information;

    c.   Cooperate with us in the investigation, settlement, or defense of the Claim or Suit—the Insurer may require that the Insured submit to examination or questioning, attend hearings, depositions, and trials—additionally, in the course of investigation or defense, the Insurer may require written and/or sworn statements concerning the Claim; and

    d.   Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured, or which provides similar benefits to the Insured, because of injury or damage to which this Policy may also apply.

3.   No Insured will, except at its own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our prior consent in excess of any applicable SIR without prior written consent of the Insurer.

## SECTION VIII – TERMINATION AND NON-ASSIGNABILITY OF THE POLICY

It is agreed that this Policy will automatically terminate upon the acquisition of the Insured by another entity or the merger of the Insured into another entity, such that the Insured is not the surviving entity, or the consolidation of the Insured with another entity, or the acquisition of substantially all of the assets of the Insured by another entity.  No interest, coverage, or rights under this Policy may be assigned or transferred to any other person or entity without the prior written consent of the Insurer.  This Policy is issued to the Insured as owned and managed at the time of the Application and does not transfer upon a change in ownership or management without prior written approval of the Insurer.

## SECTION IX – GENERAL CONDITIONS

A.  Legal Action Against Us

No person or organization has a right under this Policy to:

1.   Join the Insurer as a party or otherwise bring them into a Suit asking for Damages from an Insured; or

2.   Sue the Insurer under this Policy unless all of the terms of the Policy have been fully complied with by the Insured.

A person or organization may sue the Insurer to recover on an Agreed Settlement or a final judgment obtained after an actual trial against an Insured, but the Insurer will not be liable for Damages that are not payable under the terms of this Policy or that are in excess of the applicable Limits of Liability available to an Insured.

B.  Bankruptcy

It is agreed that the Insured's bankruptcy or insolvency shall not relieve the Company of its obligations under this Policy.  In the event of receivership, insolvency, and/or inability to pay by the Primary Insurer for any reason, this Policy shall operate as if such Primary Insurance were available and collectible. The liability of the Company under this Policy shall in no way be increased or expanded as a result of such Primary Insurer's receivership, insolvency or inability to pay.

C.  Retroactive Limitation Clause

This Policy does not apply to:

1.  Claim(s), conditions or circumstances which have been notified to an insurer during any other policy which was effective prior to the inception date of this Policy; or

2.  Claim(s), conditions or circumstances which prior to the Policy's inception the Named Insured knew or should have reasonably known could give rise to a Claim under this Policy.

D.  Cancellation

1.  Except as indicated in the Declarations or any Endorsement, by entering into this Policy, neither the Insurer nor the Insured are bound to continue coverage through the entire Policy Period and either may cancel the Policy for any reason, subject to the terms and conditions of this Policy, including without limitation, the conditions regarding earned and returnable premiums.

2.  The Insured shown on the Declarations may cancel this Policy by mailing a request to cancel to the Insurer.

3.  The Insurer may cancel this Policy by mailing first class or by hand delivery to the Insured written notice of cancellation at least:

a.  10 days before the effective date of cancellation if we cancel for nonpayment of premium or upon your failure to pay any premium or any other cost or fee required to be paid under the terms of this Policy; or

b.  10 days before the effective date of cancellation if we cancel for any other reason, unless a longer period of time is specifically required by applicable law.

4.  In the event this Policy is cancelled by the Insurer for nonpayment of premium, any other policy issued to the Insured by the Insurer, or one of its affiliates, will also become subject to cancellation with 10-days notice, or as required by applicable law.

5.  The Insurer will mail or deliver any notice of cancellation or any other notice to be delivered under this Policy to the Insured's mailing address shown on the Declarations or on any written Endorsement changing such address.

6.  Notice of cancellation will state the effective date of cancellation and the Policy Period will end on that date.

7.  If this Policy is cancelled by the Insured or Insurer, the premium for the period from the date of cancellation to the expiration date will be refunded at the greater of the percentage of Premium Earned at Inception shown on the Declarations or the short-rate, all of which will be deemed the minimum, fully earned premium for the cancelled Policy. The total premium will be deemed the minimum, fully earned premium in the event a Claim is made at any time on this Policy prior to cancellation. The cancellation will be effective even if we have not made or offered a refund.

8. If notice is mailed, a prepaid proof of mailing is sufficient proof of notice to the Insured. Notice deposited in the mail in the manner described above shall be effective when so deposited.

9. This Policy is not subject to renewal. The Insurer has no obligation to offer you insurance in the future and has no obligation to provide you with further notice of the expiration of this Policy. The Insurer may, at its option, offer you terms for future separate policies.

10. At no time will cancellation of this Policy for any reason require the Insurer to refund an amount of premium over or above the minimum, fully earned premium set out in this Policy.

E.   Transfer of Rights of Recovery and Subrogation

If the Company makes any payment under this Policy, the Company shall be subrogated to the Insured's rights against any person or organization, including the right to participate with the Insured and the Primary Insurer in the exercise of all the Insured's rights of recovery. The Insured shall execute and deliver instruments and papers to the Company and do whatever else is necessary to secure such rights. The Insured shall do nothing to prejudice such rights.

All payments and settlements obtained by the Insured after a settlement under this Policy shall be applied as if obtained prior to the settlement and all necessary adjustments shall then be made between the Insured and the Company.

F.   Other Insurance

1.   If other valid and collectible insurance, whether primary, excess, or contingent or on any other basis, including any form of self-insurance or SIR, is available to an Insured for a loss covered under this Policy, then:

   a.   This Coverage is excess over the other insurance, including any form of self-insurance or SIR; and

   b.   We will have no duty to defend any Claim or Suit that any other insurer has a duty to defend.  If no other insurer or issuer of a form of self-insurance or SIR defends, we may undertake to do so, but we will then be entitled to enforce the Insured's rights against those other insurers, self-insurers, or self-insured entity for defense costs, contribution, or indemnity.

2.   When both this Policy and other insurance, whether primary, excess, or contingent or on any other basis, including any form of self-insurance or SIR, apply to the loss on the same basis, we will not be liable under this Policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

   a.   If all such other insurance provides for contribution by equal shares, we shall not be liable for a greater proportion of such loss than that which would be payable if each Insurer or self-insured entity contributes an equal share until the share of each Insurer or self-insured entity equals the lowest applicable Limits of Liability under any one policy or coverage contract or the full amount of the loss is paid.  With respect to any amount of the loss not so paid, each remaining Insurer or self-insured entity will then contribute an equal share of the remaining amount of the loss until each such Insurer has paid its limit in full or the full amount of the loss is paid.

   b.   If all such other insurance does not provide for contribution by equal shares, the Insurer shall not be liable for a greater proportion of such loss than the applicable Limits of Liability under this Policy bears to the total applicable Limits of Liability of all other valid and collectible insurance applicable to such loss.

3.   If this Policy and any other policy or coverage contract issued to you by us or any company affiliated with us apply to the same Ultimate Net Loss or series of Ultimate Net Losses, the aggregate maximum Limit of Liability or any applicable Sub-limits under all of the policies and coverage contracts shall not exceed the highest applicable Limit of Liability or Sub-limit under any one policy or coverage contract.  This condition

does not apply to any policy or coverage contract issued by us, or an affiliated company, specifically to apply as excess insurance over this Policy.

However, with respect to the Primary Insurance, this Policy shall only apply when the Limit of Liability is exhausted upon the actual payment by the Primary Insurer of Ultimate Net Loss and in no way shall this Policy contribute on a pro rata basis with that Primary Insurance.

G.  Premium

1.  We will compute the premium for this Policy in accordance with our rules and rates at the time coverage is issued on behalf of the Insured.

2.  The premiums shown on this Policy as the advance premiums are minimum-earned and deposit premiums only.  At the close of each audit period, we will compute the earned premium for the Policy Period shown on the Declarations.  Audit premiums are due and payable on notice to the Insured.  If the sum of the advance and audit premiums paid for the Policy Period is greater than the earned premium charge, any prepaid premium charges become the fully earned premiums for the Policy Period.

3.  The Insured must keep records of the information we need for coverage charge computation and send us copies at such times as we may request them.

4.  In the event of any Claim, the minimum, fully earned premium for the Policy will be 100% of the total premium stated on the Declarations, and such minimum, fully earned premium will replace any other minimum-earned premiums charged and will not be subject to short-rate or pro-rata adjustment.

5.  In the event the Insured fails to tender the required premium amount and the Insurer incurs collection expenses, the Insurer shall be entitled to recover all costs of collection including, but not limited to reasonable attorneys' fees, costs, and expenses from the Insured.

H.  Insured's Representations and Warranties

By accepting this Policy, you represent, warrant, and agree that:

1.  The completed Application and any supplemental applications or other documentation provided to obtain this Policy do not contain any material inaccuracies, omissions, mistakes, misrepresentation, false statements or errors of fact, regardless of whether the information was provided by you or your broker or agent;

2.  You understand the information provided in and with your Application for insurance has been relied upon by the Insurer in pricing coverage and issuing the Policy and the Application, along with any other information provided by you, forms a part of the Policy; and

3.  The Policy is a "manuscript policy," which means it does not follow any "standard" insurance policy form and represents a negotiated agreement between you and the Insurer, and you had the opportunity to seek the advice of legal counsel with regard to the negotiations for and the execution and performance of the Policy; and

4.  Any insurance broker or agent involved in obtaining the Policy represents you and not the Insurer, and the broker or agent is not authorized to bind coverage on behalf of the Insurer, and you do not assume the broker or agent has any implied or apparent authority to bind the Insurer; and

5.  You are subject to all the Policy provisions, terms, and conditions;

6.  You shall retain in full force and effect the specifically scheduled Primary Insurance for the duration of the Policy Period and shall immediately furnish to us a copy of any changes or endorsements to the Primary Insurance.

I.   Transfer of Rights of Recovery Against Others To Us

If an Insured has rights to recover all or a part of any payment for Damages or Claim Expenses we have made under this Policy from any person or organization, those rights are hereby transferred to the Insurer.  The Insured must do nothing after the loss to impair these rights.  At our request, the Insured will bring Suit or transfer those rights to us and will do all things we request to assist us to enforce those rights and collect payments made under the Policy.

J.   Non-Assignable

No interest, coverage, or rights under this Policy may be assigned or transferred to any other person or entity without the prior written consent of the Insurer.  This Policy is issued to the Insured as owned and managed at the time of the Application and does not transfer upon a change in ownership or management without prior written approval of the Insurer.

K.   Changes

This Policy, including any Endorsements, contains all of the agreements between the Insured and the Insurer concerning the insurance provided by the Policy.  The coverage terms can be amended or waived only by Endorsement issued by the Insurer, and not by any broker or agent, and made a part of the Policy.

Endorsements adding additional Insureds, coverage, or otherwise materially changing the Policy will require additional premium to be collected from the Insured before the Endorsement will become effective. Any additional premium associated with any Endorsement will be calculated by the Insurer based upon its then current rates; although, no specific rate is guaranteed to the Insured.

L.   Examinations, Inspections, and Surveys

The Insurer has the right, but is not obligated to:

1.   Examine and audit your books and records as they relate to this Policy at any time during the Policy period and up to three years thereafter;

2.   Make inspections and surveys of the Insured and its operations, premises, equipment, property, and books at any time;

3.   Prepare reports on the results of the inspections and surveys, and provide copies of said reports to the Insured; and

4.   Recommend and/or require changes, repairs, or other acts to be completed as a condition precedent to continued coverage under the Policy.

The inspections, surveys, reports, or recommendations relate to the insurability of an Insured and the coverage charge to be made.  We do not make safety inspections, undertake to provide legal advice or opinions, or perform the duty to any person or organization to provide for the health or safety of workers or the public, and we do not warrant that conditions of the Insured's premises or other working environment under the Insured's control are safe or healthy, or comply with any or all federal, state, county, or local laws, regulations, codes, or standards. This limitation of our service applies not only to us, but also to any rating, advisory rating service, or similar organization or individuals that may provide insurance inspections, surveys, reports, or recommendations at the request of the Insurer.

M.   Premium Audit

The initial premium for this Policy represents a minimum estimated premium based upon the exposures you told us you would have when you requested coverage.  We expressly retain the right to conduct a premium audit of

your records at any time to determine if the exposures are ultimately greater than you told us.  This premium audit may take the form of a request of you to provide proof of exposures by completing a self-audit form and supplying any type of supporting business records (such as proving gross receipts) or an audit conducted by our agent by physically inspecting your books and records.  In the event you fail to comply with any premium audit request, including failing to provide any requested information, you authorize us to assume additional exposures and charge and collect from you the greater of an additional premium equal to 25% of the original premium and the actual amount due based upon any premium audit findings.  You also expressly agree to pay any costs associated with our efforts to collect any additional premium due from you.  Under no circumstance will the minimum estimated premium be reduced as the result of any premium audit—the original premium represents a minimum premium for the Policy.

N.  False or Fraudulent Claim

If any Insured shall make any Claim under this Policy knowing such Claim to be false or fraudulent, as regards to amount or otherwise, this Policy shall become null and void and all coverage hereunder shall be forfeited.

O.  Given the unique features of the coverage being provided to the Insured, coverage has been quoted, bound and issued with the express condition that the Insured acknowledge receipt and acceptance of the terms and conditions of coverage by returning the Receipt Form provided herewith.  Coverage is subject to cancellation in the event the Insured fails to acknowledge receipt and acceptance of the terms and conditions of coverage by returning the Receipt Form provided.

## SECTION X – REIMBURSEMENT

In the event we provide a defense for an Insured under the Policy and it is at any time determined that any Claim or theory of recovery for which a defense has been provided by us is not covered under the Policy, we expressly reserve the right to seek reimbursement of any Damages and/or Claim Expenses associated with any such Claim or theory of recovery from the Insured, including reimbursement on a prorate basis for that portion of any Claim or theory of recovery not covered if multiple Claims or theories of recovery have been asserted.

## SECTION XI – SEVERABILITY

The provisions of this Agreement are severable.  If any portion, provision, or part of this Agreement is held, determined, or adjudicated to be invalid, unenforceable, or void for any reason whatsoever, each such portion, provision, or part shall be severed from the remaining portions, provisions or parts of this Agreement and shall not affect the validity or enforceability of any remaining portions, provisions, or parts.

## SECTION XII – MUTUAL AFFIRMATION

Pursuant to the signature, facsimile or otherwise, appearing on the Application, quote, warranty form, Policy, or any other document provided to the Insurer to obtain insurance coverage, the parties affirm that all provisions serve to embody and articulate the entire agreement between the parties hereto, and that the parties unqualifiedly accept and agree to abide by the terms and conditions of the Policy.

## SECTION XIII – GOVERNING LAW

This Agreement is entered into in the State of Utah and the Agreement, and any rights, remedies, or obligations provided for in this Agreement, shall be construed and enforced in accordance with the laws of Utah.

## SECTION XIV – CONSENT TO EXCLUSIVE JURISDICTION

The Insured understands and acknowledges that the Insurer conducts its business activities, including underwriting, risk management and claims services within the State of Utah.  The Insured represents and acknowledges that the Insured has purposefully directed its actions to procure the insurance services of the Insurer within the State of Utah and, for that purpose, will make continuous and systematic requests for the Insurer's services in the State of Utah.

The Insured acknowledges that, by entering into this policy of insurance, the Insured is deemed to be transacting business within the State of Utah such that the courts of Utah may exercise jurisdiction over it regarding any issues arising out of this Policy. In addition, the Insured hereby understands and consents to the jurisdiction of the courts in the State of Utah and agrees that those courts shall be the exclusive forum for the resolution of any claims or disputes arising between the parties related to any insurance coverage issues and any payments due the Insured under the Policy, unless both the Insurer and Insured agree otherwise in writing.

## SECTION XV – DEFINITIONS

A. "Accident" means an incident, event, or circumstance which is unexpected and unintended from the standpoint of any Insured.

B. "Agreed Settlement" means a settlement and/or release of liability signed and/or authorized in writing by the Insurer.

C. "Application" means the application for insurance coverage form, and any information provided therewith, completed by or for or on behalf of the Insured requesting insurance coverage from the Insurer.

D. "Claim(s)" means any demand for Damages, including a written demand, a civil action, Suit, or institution of arbitration proceeding.

E. "Claim Expenses" mean:

  1. All fees, costs, and expenses charged by any lawyer or other service provider designated by the Insurer to represent the Insured; and

  2. All other fees, costs, and expenses, including the Insurer's own internal fees, costs, and expenses, or those of an affiliate, resulting from the investigation, adjustment, defense, and appeal of a Claim, as authorized by the Company.

  The determination of the Insurer as to the reasonableness of Claim Expenses shall be conclusive on the Insured. All Claim Expenses reduce the available Policy limits.

F. "Damages" means a compensatory sum, monetary judgment, award, or settlement an Insured is or may reasonably become legally obligated to pay as the result of an Accident, but does not include fines or statutory penalties, sanctions, whether imposed by law or otherwise, punitive, exemplary, treble damages, or any multiplied portion of a compensatory award, nor the return or restitution of legal fees, costs, and expenses.

G. "Declarations" means the summary of coverage provided in conjunction with this Policy setting forth essential terms that are expressly deemed a part of this Policy.

H. "Endorsement" means any additional coverage or limitation of coverage contained in any attachment or addendum to this Policy. Any Endorsement is an indispensable and indivisible part of this Policy.

I. "Limit(s) of Liability" means the maximum amount the Insurer will be obligated to pay for an otherwise covered Claim, including payment for Claim Expenses, Damages, or any other sums due under this Policy, the amount of which is set forth on the Declarations.

J. "Policy" means the Policy issued by the Insurer to the Insured, including all Endorsements thereto.

K. "Policy Period" means the period of time beginning on the "Effective Date," as stated on the Declarations, and ending on the earlier of the initial "Expiration Date," as stated on the Declarations, and any effective cancellation date pursuant to the terms of the Policy.

L.  "Primary Insurance" means the policy of insurance specifically scheduled on the Declarations or by Endorsement to this Policy, which is issued to the Insured and for which premiums have been paid and which is in full force and effect during the Policy Period.

M.  "Primary Insurer" means the insurance carrier which has provided Primary Insurance to the Insured.

N.  "Primary Policy Limits" means the amount the insurer of the Primary Insurance is obligated to pay for an otherwise covered Claim, including payment for Claim Expenses, Damages, or any other sums due under the Primary Insurance.

O.  "Property Damage Cleanup Sublimit" means the most we will pay for costs to clean up, remove or otherwise mitigate damage, debris, spilled cargo, or any other impediment or impairment to property not owned by an insured, which is caused by an Accident that is covered by this Policy.

P.  "Retroactive Date" means any date expressly identified on the Declarations as the Retroactive Date.  If no Retroactive Date is expressly identified on the Declarations, no coverage is provided for any period of time before the Effective Date.  A Retroactive Active date expands the time during which the Wrongful Act may have occurred for purposes of determining coverage.  However, the inclusion of a Retroactive Date does not alter the requirement that a Claim must be made during the Policy Period in order to qualify for coverage.

Q.  "Self-Insured Retention" or "SIR" means the amount set forth on the Declarations that the Insured is required to pay for each and every Claim for any combination of Damages and/or Claim Expenses otherwise covered under this Policy.  The Insured will pay 100% of the Self-Insured Retention before any payment is due pursuant to the terms of this Policy.

R.  "Suit" means any proceeding seeking recovery for Damages for Bodily Injury or Property Damage, including:

1.  Any civil action filed in a court of law;

2.  An arbitration proceeding to which you must submit or do submit with our consent; or

3.  Any other alternative dispute resolution proceeding to which you submit with our consent.

S.  "Ultimate Net Loss" means the total amount that the Insured is legally obligated to pay as Damages for a covered Claim either by adjudication or a settlement to which the Company agrees in writing. Ultimate Net Loss includes deductions for recoveries and salvages which have been or will be paid and Claim Expenses incurred with respect to Claim(s) covered under the policy.  Ultimate Net Loss does not include office costs, expenses, or salaries of the Insured.

## GENERAL CHANGE ENDORSEMENT
## PAP-99-16

**This Endorsement changes the terms and conditions of the Policy issued.  Please read it carefully!**

Subject to all of the terms and conditions of the Policy, unless expressly changed hereby, this Endorsement and any attached Endorsement(s) are to be deemed and form a part of the following Policy:

**SC18121397**

**Reference No:**

Insured:  **Juul Labs Inc**

Insurer:     **Prime Insurance Company**

At its agency located in Sandy, Utah          Endorsement Effective Date:  **8/14/2018**

Endorsement type date:  **12/28/2018**          Mountain Standard Time

The undersigned hereby represents, acknowledges, and agrees that the Policy is amended through the inclusion of this Endorsement, and any attached Endorsement(s), as follows:

- Primary Layer - Lloyds/Syndicates 2623/623  $5M with $1M SIR per claim Policy #V11634 Eff 7/1/18 to 7/1/19
- Lead Layer - Lloyds/Vide  $2.5M X $5M Policy #JM10008 Effective 8/1/18 to 7/1/19
- $10M X $7.5M - Lexington Ins Policy #023627242 Effective 8/1/18 to 7/1/19
- $5M X $17.5M - Beazley/Syndicates 2623/623  Policy #W1F44F180201 Effective 8/1/18 to 7/1/19
- $10M X $22.5M - Gemini Policy #CEX09602756-01  Effective 8/1/18 to 7/1/19
- $2.5M X $32.5M -  Colony Insurance Company #AR3462599  Effective 8/14/18 to 7/1/19
- $15M X $35 M - Hamilton Re  #CX18-6934 Effective 8/14/18 to 7/1/19
- $10M X $50 M - Endurance Specialty Insurance Ltd. #EXC10013602700  Effective 8/14/18 to 7/1/19
- Coverage Retro Effective 8/14/2018
- Coverage Expiration  7/1/2019

| | |
|---|---|
| **Total Premium:** | **$0.00** |
| **State Tax:** | **$0.00** |
| **SLSC:** | **$0.00** |

All other terms and conditions of the policy remain unchanged.

Endorsement: **1**

_____
Authorized Signature

## SCHEDULE OF PRIMARY INSURANCE ENDORSEMENT

### PCL-99-31

**This Endorsement changes the terms and conditions of the Policy issued.  Please read it carefully!**

The Insured represents and warrants the following to be Primary Insurance as referenced in the Policy:

| | |
|---|---|
| Primary Insurer | Endurance Specialty Insurance Ltd. |
| Primary Insurer Policy # | EXC10013602700 |
| Coverage | Excess Liability- Quota Share |
| Limit of Primary Insurer | $10,000,000.00 Per Occurrence |
| | $10,000,000.00 Annual Period Aggregate |
| | $50,000,000.00 Per Occurrence Retention or Schedule B, whichever is greater |

All other terms and conditions of the Policy remain unchanged.