Andrew D. Wright, #8857
Andrew B. McDaniel, #11070
STRONG & HANNI
9350 South 150 East, Suite 820
Sandy, Utah 84070
Telephone:  (801) 532-7080
Facsimile:  (801) 323-2037
awright@strongandhanni.com
amcdaniel@strongandhanni.com
*Attorneys for Plaintiff*

---

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PRIME INSURANCE COMPANY<br><br>Plaintiff,<br><br>v.<br><br>JUUL LABS, INC.<br><br>Defendant. | **AMENDED COMPLAINT FOR DECLARATORY RELIEF**<br><br><br>Case No: 2:19-CV-00925-HCN<br><br>Judge:  Howard C. Nielson, Jr. |

Plaintiff Prime Insurance Company ("Prime"), by and though counsel and pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, hereby complains and alleges against JUUL Labs, Inc. ("JUUL") as follows:

### PARTIES

1.     Prime is an insurance company incorporated under the laws of the State of Illinois, with its principal place of business in Utah.

2.     Defendant JUUL is a Delaware company with its principle place of business in San Francisco, California.

## JURISDICTION

3.     Jurisdiction and venue are proper in this Court and County pursuant to Utah Code Annotated Sections 78B-3-304, 78B-6-401, and 78B-3-307.

4.     Prime issued an Excess Liability Policy to JUUL in the form of Policy No. SC18121397, with coverage effective dates of August 14, 2018 through July 1, 2019 and a retroactive date of August 14, 2018 ("the Prime Policy"). (*See* Prime Policy, attached hereto as Ex. 1).

5.     Pursuant to the plain terms of the Prime Policy, Prime and JUUL have contractually agreed to submit to jurisdiction and venue in any court within the State of Utah and have agreed that Utah law will be applied.

6.     Specifically, the Prime Policy sets forth the following provisions related to jurisdiction:

### SECTION XIII – GOVERNING LAW

This Agreement is entered into in the State of Utah and the Agreement, and any rights, remedies, or obligations provided for in this Agreement, shall be construed and enforced in accordance with the laws of Utah.

### SECTION XIV – CONSENT TO EXCLUSIVE JURISDICTION

The Insured understands and acknowledges that the Insurer conducts its business activities, including underwriting, risk management and claims services within the State of Utah. The Insured represents and acknowledges that the Insured has purposefully directed its actions to procure the insurance services of the Insurer within the State of Utah and, for that purpose, will make continuous and systematic requests for the Insurer's services in the State of Utah. The Insured acknowledges that, by entering into this policy of insurance, the Insured is deemed to be transacting business within the State of Utah such that the courts of Utah may exercise jurisdiction over it regarding any issues arising out of this Policy. In

2

addition, the Insured hereby understands and consents to the jurisdiction of the courts in the State of Utah and agrees that those courts shall be the exclusive forum for the resolution of any claims or disputes arising between the parties related to any insurance coverage issues and any payments due the Insured under the Policy, unless both the Insurer and Insured agree otherwise in writing.

(*See* Prime Policy, pp. 9-10, Ex. 1.)

7.      By entering into the Prime Policy, JUUL acknowledged that Prime conducted its activities within the State of Utah and transacts its primary business operations within the State of Utah.

8.      With that understanding, JUUL purposefully directed its actions to procure services within the State of Utah and made continuous and systematic requests for services within the State of Utah.

## GENERAL FACTUAL ALLEGATIONS

9.      Plaintiff incorporates each of the allegations set forth above as though fully set forth herein.

### A.  Application Process:

10.     Prime is an excess and surplus lines insurer which issues various forms of customized, or manuscript, insurance policies throughout the United States.

11.     JUUL manufactures e-cigarettes that use a cartridge, or pod, containing oil that can be heated into a vapor and inhaled.

12.     Over the years, JUUL has obtained a substantial market presence, by some estimates, as much as 70% of the e-cigarette business in the United States.

13.     JUUL, through its insurance broker RT Specialty, first approached Prime in July of 2018 asking that Prime consider issuing excess liability coverage to JUUL.

3

14.     At that time, JUUL submitted an application in which it was asked if it had "any claims in the last 5 years."  JUUL responded "yes."

15.     In support of its response, JUUL submitted Loss Runs showing several prior claims that had been made against the company.

16.     The Loss Runs did not show any claims made against JUUL in 2018.

17.     JUUL also submitted an industry-standard Acord Application, signed by its broker.

18.     The Acord Application asked JUUL to disclose any "claims or losses (regardless of fault and whether or not insured) or occurrences that may give rise to claims."

19.     The Acord Application does not disclose any such claims, losses or occurrences.

20.     As negotiations between Prime and JUUL continued, JUUL's broker indicated that "[JUUL] have not had any product claims."

21.     On August 3, 2018, Prime issued an initial quote for insurance, however, that quote was not accepted by JUUL.

22.     On August 10, 2018, Prime issued a revised quote which again was not accepted by JUUL.

23.     In November of 2018, JUUL, through its brokers, asked Prime to quote a different layer of excess liability coverage.

24.     Prime issued a quote for excess liability coverage of $5,000,000 in excess of $60,000,000 in underlying coverage on December 17, 2018.

25.     On December 18, 2018, Prime learned that there may be existing or threatened class action litigation against JUUL arising out of its manufacturing and distribution of flavored e-cigarette pods that were alleged to be marketed and sold to children.  Such litigation alleged that

some of the flavors manufactured by JUUL such as mango, fruit medley and crème brulee were especially attractive to youth.

26.     Upon learning this information, Prime withdrew its December 18, 2018 quote.

27.     On December 19, 2018, Prime had a conference call with JUUL and its brokers.  At that time, JUUL represented to Prime that it had pulled the flavored e-cigarette pods from the market and that they were no longer being sold.

28.     JUUL also represented to Prime that it had no known pending claims, losses or occurrences that would fall within the anticipated August 14, 2018 through July 1, 2019 policy period.

29.     Based on these representations, Prime reinstated its December 17, 2018 quote.

30.     As Prime was working to bind the Policy, Prime asked JUUL to submit forms to again confirm there were no known claims, losses or occurrences that could lead to a claim within the policy period.

31.     A Coverage Request Form signed by JUUL and its broker cautioned JUUL about its duties to disclose material facts to Prime.

32.     Similarly, a Claims Warranty and Coverage Statement signed by JUUL and its broker indicated that the prior application documents and other supplemental information submitted by JUUL was true and correct and inclusive of all material information, and would be relied upon by Prime.

33.     JUUL and its broker also signed a form requesting disclosure of information about any known claims or lawsuits.  JUUL and its broker did not identify any claims or lawsuits.

34.     On December 21, 2108, JUUL also signed and submitted a Claims History and Incident Disclosure History form asking JUUL to identify any known claims, losses or occurrences that could lead to a claim.  JUUL did not disclose any claims, losses or occurrences in the form.

35.     As Prime was processing the documents submitted by JUUL and its broker, Prime noted that JUUL had not answered one of the questions in the Claims History and Incident Disclosure History form regarding potential claims.  As such, Prime sent the form back to JUUL's broker to be completed.

36.     JUUL and its broker then sent a revised form which included a response to the following question: Are you aware of any prior incident, event, or occurrence that might reasonably be expected to lead to a claim, lawsuit, notice of loss, or loss?"  JUUL answered "No" in response to this question.

37.     JUUL also submitted updated loss runs which identified several prior claims and lawsuit involving incidents that occurred prior to the Policy's inception and retroactive date of August 14, 2018 – which would therefore not be covered by the Policy.

38.     Based on the information submitted, Prime then issued the Prime Policy to JUUL.

39.     Despite the above representations, Prime was recently informed by JUUL that, while it is no longer manufacturing flavored e-cigarette pods, such pods were still being sold in various places throughout the United States until only recently.

40.     Moreover, despite the representations that the flavored products had been removed from the market, JUUL recently informed Prime that it was continuing to directly sell the flavored e-cigarette pods online.

41.     In fact, Prime has now learned that the ongoing sale of flavored e-cigarette pods has resulted in the filing of several class action lawsuits, and other litigation, in various parts of the country.  These claims were not reported to Prime in the binding process or since.

42.     Despite representations to the contrary as outlined above, Prime has information and belief that JUUL knew of some or all of the pending lawsuits involving the manufacturing and sale of flavored e-cigarette pods and did not disclose the same to Prime.

43.     Accordingly, Prime has notified JUUL of the failure to disclose material information, and the apparent misrepresentations during the binding process.

44.     Prime has tendered all premium paid by JUUL for the Prime Policy.

**B.  The Prime Policy:**

45.     The Prime Policy establishes as follows, in relevant part, regarding the scope of coverage provided:

**EXCESS LIABILITY POLICY (FOLLOW FORM)**

**FFEL-00-01**

**. . .**

**Coverage is provided only for otherwise covered Claims which meet all of the following requirements:**

**. . .**

**(2)     Which are first made against an Insured during the Policy Period, and**

**(3)     For which written notice is given to the Company during the Policy Period in accordance with the specific informational and timeliness requirements specified in the Policy, and**

**(4)     For which written notice is given to the Primary Insurer during the Policy Period in accordance with the specific informational and timeliness requirements specified in the Primary Insurance policy.**

. . .

## SECTION I – COVERAGE

A.    Insuring agreement

    1.    Subject to all of the terms, limitations, conditions, definitions, exclusions and other provisions of this Policy, we shall indemnify the Insured for Ultimate Net Loss in excess of the Primary Insurance which results from Claims made against the Insured and reported to the Company and the Primary Insurer during the Policy Period.

    2.    Coverage under this Policy shall be effective only after the limit of liability of the Primary Insurance has been reduced or exhausted by the actual payment of Ultimate Net Loss to which this Policy applies.

    3.    Except as provided herein, coverage under this Policy shall apply in conformity with and subject to the warranties, limitations, conditions, provisions, and other terms of the Primary Insurance.

(*See* Prime Policy, p. 1, Ex. 1.)

    46.    Furthermore, the Prime Policy includes the following relevant Condition:

## SECTION IX – GENERAL CONDITIONS

. . .

C.    Retroactive Limitation Clause

This Policy does not apply to:

    1.    Claim(s), conditions or circumstances which have been notified to an insurer during any other policy which was effective prior to the inception date of this Policy; or

(*See* Prime Policy, p. 5, Ex. 1.)

    47.    The Prime Policy also sets forth the following relevant Definitions:

## SECTION XV – DEFINITIONS

. . .

F.      "Damages" means a compensatory sum, monetary judgment, award, or settlement an Insured is or may reasonably become legally obligated to pay as the result of an Accident, but does not include fines or statutory penalties, sanctions, whether imposed by law or otherwise, punitive, exemplary, treble damages, or any multiplied portion of a compensatory award, nor the return or restitution of legal fees, costs, and expenses.

. . .

S.      "Ultimate Net Loss" means the total amount that the Insured is legally obligated to pay as Damages for a covered Claim either by adjudication or a settlement to which the Company agrees in writing. Ultimate Net Loss includes deductions for recoveries and salvages which have been or will be paid and Claim Expenses incurred with respect to Claim(s) covered under the policy. Ultimate Net Loss does not include office costs, expenses, or salaries of the Insured.

(*See* Prime Policy, pp. 10-11, Ex. 1.)

48.    Endorsement PCL-99-31 of the Prime Policy identifies the Primary Insurance as Endurance Specialty Insurance Ltd., with a primary policy no. EXC10013602700 (the "Endurance Policy"). (*See* Prime Policy, End. PCL-99-31, Ex. 1.) Accordingly, coverage under the Prime Policy is also subject to the following "limitations, conditions, provisions, and other terms" of the following policy. (*See* Prime Policy, p. 1, Ex. 1.)

**C.  The Endurance Policy:**

49.    The Endurance Policy explains as follows concerning the scope of coverage provided, in relevant part:

**INSURING AGREEMENTS**

**I – COVERAGE**

Endurance Specialty Insurance Ltd. (the "Company") shall, subject to the limitations, terms, conditions and exclusions below, indemnify the **Insured** for **Ultimate Net Loss** the Insured pays by reason of liability:

. . .

9

For **Damages** on account of:

(i)    **Personal Injury**

(ii)   **Property Damage**

(iii)  **Advertising Liability**

Encompassed by an **Occurrence**, provided:

> **COVERAGE A:** notice of the Occurrence shall have been first given by the Insured in an Annual Period during the Policy Period in accordance with Article V of this Policy, or

(*See* Endurance Policy, p. 1 of 37, Ex. 2.)

50.    The Endurance policy sets forth the following relevant definitions:

G.    "**Damages**" means all forms of compensatory damages, monetary damages and statutory damages, punitive or exemplary damages and costs of compliance with equitable relief, other than governmental (civil or criminal) fines or penalties, which the **Insured** shall be obliged to pay by reason of judgment or settlement for liability on account of **Personal Injury**, **Property Damage** and/or **Advertising Liability** covered by this Policy, and shall include **Defense Costs**.

. . .

L.    (1)    **Nature of Expectation or Intent**

**Personal Injury, Property Damage** or **Advertising Liability** shall be "**Expected or Intended**" where:

(a)    actual or alleged **Personal Injury, Property Damage** or **Advertising Liability** is expected or intended by an **Insured**;

. . .

V.    (1)    An "**Occurrence**" exists if, and only if:

. . .

(a)    actual or alleged **Personal Injury** to any individual person, or actual or alleged **Property Damage** to any specific property, arising from the **Insured's Products** takes place on or subsequent to the

**Inception Date**, or the **Retroactive Coverage Date**, if applicable, and before the **Termination Date** of Coverage A.

. . .

(2)     Except as provided in paragraph (3) below, where an Occurrence exists and a series of and/or several actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities** occur which are attributable directly, indirectly or allegedly to the same actual or alleged event, condition, cause, defect, hazard and/or failure to warn of such, all such actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities** shall be added together and treated as encompassed by one **Occurrence** irrespective of the period (but without limiting the effect of Exclusion IV.A*)* or area over which the actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities** occur or the number of such actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities;** provided, however, that any actual or alleged **Personal Injuries, Property Damage or Advertising Liability** which is **Expected or Intended** by any **Insured** shall not be included in any **Occurrence.** So far as **Personal Injuries, Property Damages** and/or **Advertising Liabilities** resulting or alleged to result from the design, formulation, manufacture, distribution, use, operation, maintenance and/or repair of an **Insured's Product**, and or the failure to warn as to the use, operation, maintenance and/or repair of an **Insured's Product**, the term "the same actual or alleged event, condition, cause, defect, hazard and/or failure to warn of such" means any such design, formulation, manufacture, distribution, use, operation, maintenance, repair and/or failure to warn, as the case may be, as to which such losses, injuries or damages are directly, indirectly or allegedly attributable.  As respects **Advertising Liability**, multiple or repeated broadcasts or publications of the same or similar materials shall constitute "the same actual or alleged event, condition, cause or defect."

. . .

W.     "**Personal Injury**" means **Bodily Injury**, mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation and libel, slander or defamation of character or invasion of rights of privacy.

(*See* Endurance Policy, pp. 4-5, 11-12 of 37, Ex. 2.)

51.     The Endurance Policy sets forth the following relevant Exclusions:

11

**IV – EXCLUSIONS**

This Policy does not apply to actual or alleged:

**A.     PRIOR TO INCEPTION OR RETROACTIVE COVERAGE DATE**

> **Personal Injury** to any individual person, **Property Damage** to any specific property or **Advertising Liability** which takes place prior to the **Inception Date** or, if applicable, the **Retroactive Coverage Date**.

> . . .

**H.     TOXIC SUBSTANCES**

> **Personal Injury, Property Damage** or **Advertising Liability** arising out of the manufacture, distribution, sale, installation, removal, utilization, ingestion or inhalation of, or exposure to or existence of, as the case may be:

> . . .

> (2)     tobacco or any tobacco products (or ingredients of, or used in the manufacture or production of, such products);

(*See* Endurance Policy, pp. 14, 17 of 37, Ex. 2.)

52.     Furthermore, the Endurance Policy includes the following relevant Endorsements:

**KNOWN OR PREVIOUSLY NOTIFIED OCCURRENCE
EXCLUSION ENDORSEMENT**

It is hereby agreed that the following exclusions are added to Article IV – Exclusions:

[This Policy does not apply to actual or alleged:…]

**Q.     PREVIOUSLY NOTIFIED OCCURRENCES OR CLAIMS**

> Any **Occurrence**, including any "Batch Occurrence", **Integrated Occurrence** or similar term as defined under any other Policy, **Personal Injury**, **Property Damage** or **Advertising Liability** or any **Claim** or potential **Claim** arising therefrom, notice of which has been given or deemed to have been given under any other policy prior to the **Inception Date**.

**R.     KNOWN OCCURRENCES**

Actual or alleged liability arising from any **Occurrence**, including any "Batch Occurrence", **Integrated Occurrence** or similar term as defined under any other policy, of which any **Executive Officer** or any manager or equivalent-level employee in the Insured's Risk Management, Insurance or Law Department was aware prior to the **Inception Date**, irrespective of whether such person believed or expected such **Occurrence**, including any "Batch Occurrence", **Integrated Occurrence** or similar term as defined under any other policy, would involve this Policy.

(*See* Endurance Policy, Endorsement No. 1, Ex. 2.)

## SPECIAL EXCLUSIONARY ENDORSEMENT
## (CONSUMER PROTECTION LAWS)

It is hereby agreed that the following exclusions are added to Article IV., – Exclusions:

[This Policy does not apply to actual or alleged:]

It is hereby agreed that notwithstanding any provision of this Policy, it is hereby agreed that this Policy shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of, any liability or alleged liability for any Personal Injury, Property Damage or Advertising  Liability arising out of or allegedly arising out of the operations, risks, events or other matters set forth below:

Violation of any consumer protection law(s) worldwide, including without limitation, those of the U.S. Federal Trade Commission (FTC), the U.S. Food and Drug Administration (FDA), Federal Communications Commission, relating to **Tobacco Product(s)**

- Marketing, including labelling and packaging, of age restricted products to minors;
- Failure to disclose long-term health effects of nicotine, or nicotine addiction;
- Marketing of any product as a safe alternative to smoking

(*See* Endurance Policy, Endorsement No. 12, Ex. 2.)

## TOBACCO PRODUCTS & TOBACCO HEALTH HAZARD EXCLUSION

It is hereby agreed that the following exclusions are added to Article IV., – Exclusions:

[This Policy does not apply to actual or alleged:]

> **Personal Injury, Property Damage**, or **Advertising Liability**, and/or any other type of injury, loss, cost or damage sustained by any person for the real or alleged emergence, contraction, aggravation or exacerbation of any form of cancer, carcinoma, cancerous or pre-cancerous condition, arteriosclerosis, heart disease or any other disease of the human body as a result of the consumption, use or the exposure to the consumption or use of any tobacco product or any product containing tobacco manufactured, supplied, sold, handled or distributed by, for, or on the behalf of the Insured or reliance upon any express or implied representation or warranty made at any time with respect to such tobacco products, or out of the exposure to such tobacco products or any by-product of tobacco including but not limited to, environmental tobacco smoke or second-hand smoke.

(*See* Endurance Policy, Endorsement No. 13, Ex. 2.)

### D.  The Colgate Action:

53.    On April 26, 2018, Bradley Colgate and Kaytlin McKnight filed a class action complaint against JUUL and Pax Labs, Inc. (the "Colgate Action"). (*See* Colgate Compl., Ex. 3.)

54.    That complaint alleged that JUUL engaged in false, fraudulent and deceptive practices in designing and marketing their products as safe, candy-like products that were attractive to minors, young adults, and non-smokers, without fully disclosing the harmful effects of those products, including nicotine addiction and related diseases/health consequences.

55.    Since the commencement of the Colgate Action, numerous other lawsuits have been filed against JUUL arising out of the same or similar alleged practices (the "marketing/design claims"). Those lawsuits include, but are not limited to, the following plaintiffs: D.P., by his mother and natural guardian, L.P.; Ben Bronstein; Connor Batham; Adam Hergenreder; Hallie Helms; Kevork Altounjian; Jamie Beyer; Kathryn and Ian Fay; Craig and Julie Shapiro; Elizabeth Swearingen and John Peavy; Tyler Richardson; Walker, David, and Candace McKnight; Jaycen Stephens and Owen Mann-Campbell; Richard Tarangelo; and Timothy Malaney.

56.     Several of those other lawsuits have been consolidated into the Colgate Action, and it is anticipated that most, if not all, of the other pending cases will likewise be consolidated.

## CLAIMS FOR DECLARATORY RELIEF

### COUNT I: NO COVERAGE UNDER THE POLICY

57.     Prime incorporates each of the allegations set forth above as though fully set forth herein.

58.     An actual dispute and controversy has arisen between Prime and JUUL regarding whether there is coverage under the Prime Policy for the marketing/design claims.

59.     There is no coverage for the marketing/design claims because such claims, and the events, conditions and circumstances giving rise to those claims, were known prior to the Prime Policy or Endurance policy inception date.

60.     Endorsement 1 of the Endurance Policy, which is incorporated by the Prime Policy, excludes coverage for any occurrence for which notice has been given under any other policy prior to the inception date, and for any occurrence which any executive officer, manager, or equivalent-level employee was aware of prior to the inception date.

61.     Moreover, that policy explains that a series of personal injuries that are directly or indirectly attributable to the same actual or alleged event, condition, cause, etc., including injuries resulting from the design, distribution or use of JUUL's product, shall be treated as one occurrence.

62.     Similarly, the Prime Policy establishes that coverage only applies to claims that are first made against JUUL and reported to Prime during the policy period.

63.    Additionally, that policy explains that coverage is excluded for "claim(s), conditions or circumstances which have been notified to an insurer during any other policy which was effective prior to the inception date" of the Prime Policy.

64.    The Prime Policy and the Endurance Policy both have inception dates of August 14, 2018.

65.    Inasmuch as the allegations related to the marketing and/or design of JUUL's products, and the events, circumstances and conditions giving rise to those allegations, predate August 14, 2018, and the Colgate Action, as well as other actions, based on such allegations were filed and reported prior to that date, coverage is precluded under the Prime Policy for any claims related to or arising out of the marketing and/or design of JUUL's products.

66.    Moreover, some of the marketing/design lawsuits were filed before or after the policy period. Accordingly, even if they did not involve the same allegations as the other prior claims, coverage would be precluded under the Prime Policy inasmuch as the claims-made coverage trigger was not satisfied with respect to those claims.

67.    There is no coverage for the marketing/design claims because those claims are based on tobacco products.

68.    Exclusion H of the Endurance policy explains no coverage is provided for personal injury arising out of the manufacture, distribution, utilization, etc. of "tobacco or any tobacco products . . ."

69.    Furthermore, Endorsement 12 excludes coverage for personal injury arising out of the violation of any consumer protection laws that relate to tobacco products, including allegations

related to the marketing and labeling of those products to minors, failure to disclose the long-term health effects of nicotine, and marketing a product as a safe alternative to smoking.

70.     Similarly, Endorsement 13 establishes coverage is precluded for personal injury related to any disease resulting from the use of any tobacco product.

71.     Accordingly, inasmuch as the claims related to or arising out of the marketing and/or design of JUUL's products are based on nicotine addiction and the negative health consequences arising therefrom, coverage is also precluded under the Prime Policy on that basis.

72.     There is no coverage for any of the marketing/design claims that were reported outside of the policy period.

73.      The Prime Policy's insuring language also establishes that coverage only applies to those claims "[f]or which written notice is given" to Prime and Endurance during the policy period.

74.     A number of the marketing/design claims were not reported to Prime or Endurance until after the Prime Policy had expired on July 1, 2019. Accordingly, coverage is also precluded for those claims on that basis.

75.     There is no coverage for any of the marketing/design claims involving prior injuries.

76.     The Endurance Policy establishes that in order to be covered, a personal injury arising from JUUL's products must take place on or after the inception date or retroactive coverage of the policy.

77.     Similarly, Exclusion A of the Endurance Policy specifically bars coverage for personal injury to a person that takes place prior to the inception/retroactive date.

78.     It appears that many of the alleged injuries at issue in the marketing/design claims occurred prior to the Prime Policy's August 14, 2018 inception/retroactive date. Coverage is precluded for such injuries, pursuant to the above provisions.

79.     There is no coverage for any damages that do not qualify as Personal Injury.

80.     The Endurance Policy defines, in relevant part, "Damages" to include compensatory, monetary and other damages that the insured becomes obligated to pay  as a result of "Personal Injury."

81.     "Personal Injury" is then defined as "Bodily Injury, mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation and libel, slander or defamation of character or invasion of rights of privacy."

82.     There is no coverage for expected or intended injury.

83.     In defining the term "Occurrence", the Endurance Policy establishes that any injuries that are expected or intended by JUUL "shall not be included in any Occurrence."

84.     The marketing/design claims set forth numerous allegations related to purported intentional/fraudulent conduct on the part of JUUL. In the event such conduct is established, coverage would also be precluded on that basis.

85.     There is no coverage for statutory penalties, punitive/exemplary damages, or legal costs and fees.

86.     The Prime Policy establishes Prime will indemnify JUUL for Ultimate Net Loss it is required to pay as Damages. Damages are then defined to exclude "punitive, exemplary, treble

damages, or any multiplied portion of a compensatory award [and] the return or restitution of legal fees, costs, and expenses."

87.    In the event any such damages are awarded as part of the marketing/design claims, Prime would have no obligation to indemnify JUUL for those damages.

## COUNT II: RESCISSION OF THE POLICY

88.    Prime incorporates each of the allegations set forth above as though fully set forth herein.

89.    An actual dispute and controversy has arisen between Prime and JUUL regarding whether there is a basis to rescind the Policy.

90.    Prime has the right to rescind the Policy because JUUL either intentionally misrepresented or failed to disclose material information regarding its operations.

91.    Specifically, JUUL represented to Prime that its flavored e-cigarette pods were no longer being sold in the United States and that the exposure that existed from prior lawsuits was no longer a concern.

92.    To the contrary, JUUL continued to sell its flavored e-cigarette pods in various parts of the country at least up until recently, including without limitation, by way of direct sales by JUUL online.

93.    This information is material to Prime as it would not have issued the Policy had it known JUUL's flavored e-cigarette pods were continuing to be sold and that JUUL had potential ongoing exposure arising from the same, as had been demonstrated in prior litigation.

94.     In addition, on information and belief, JUUL knew that several claims and suits had been filed against JUUL involving JUUL's flavored e-cigarette pods and other products which were not disclosed to Prime when the Policy was bound and issued.

95.     The information regarding the pending claims and suits against JUUL is material to Prime as it would not have issued the Policy had it known of such information.

96.     Accordingly, pursuant to Utah law and the terms of the Policy, the Court should issue a declaration that the Policy is rescinded and that Prime has no insuring obligations to JUUL.

97.     Based on the foregoing, a judicial determination is necessary and appropriate at this time to determine the respective rights of Plaintiff and Defendant under the Policy.

98.     Pursuant to Utah Code Ann. §78B-6-408, Plaintiff requests a declaration from this Court that:

(a)     There is no coverage under the Prime Policy for the marketing/design claims against JUUL because those claims, and the events, conditions and circumstances giving rise to those claims, were known prior to the Prime Policy's inception.

(b)     There is no coverage under the Prime Policy for the marketing/design claims because those claims are based on tobacco products.

(c)     There is no coverage for any of the marketing/design claims that were reported outside of the policy period.

(d)     There is no coverage under the Prime Policy for any of the marketing/design claims involving prior injuries.

(e)     There is no coverage under the Prime Policy for any damages that do not qualify as Personal Injury.

(f)     There is no coverage under the Prime Policy for expected or intended injury.

(g)     There is no coverage under the Prime Policy for statutory penalties, punitive/exemplary damages, or legal costs and fees.

(h)     Alternatively, the Prime Policy is rescinded based on material misrepresentations and failure to disclose on the part of JUUL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Prime prays for the following relief:

1.      For a declaration that:

(a)     There is no coverage under the Prime Policy for the marketing/design claims against JUUL because those claims, and the events, conditions and circumstances giving rise to those claims, were known prior to the Prime Policy's inception.

(b)     There is no coverage under the Prime Policy for the marketing/design claims because those claims are based on tobacco products.

(c)     There is no coverage for any of the marketing/design claims that were reported outside of the policy period.

(d)     There is no coverage under the Prime Policy for any of the marketing/design claims involving prior injuries.

(e)     There is no coverage under the Prime Policy for any damages that do not qualify as Personal Injury.

(f)     There is no coverage under the Prime Policy for expected or intended injury.

(g)     There is no coverage under the Prime Policy for statutory penalties, punitive/exemplary damages, or legal costs and fees.

(h)     Alternatively, the Prime Policy is rescinded based on material misrepresentations

and failure to disclose on the part of JUUL.

2.      For costs incurred herein; and

3.      For such other and further relief as the Court deems just and proper.

DATED this 2nd day of December, 2019.

STRONG & HANNI

By      /S/ Andrew D. Wright
        Andrew D. Wright
        Andrew B. McDaniel
        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of December, 2019, a true and correct copy of the

foregoing **AMENDED COMPLAINT FOR DECLARATORY RELIEF** was served by the

method indicated below, to the following:

Jason W. Hardin
Sarah C. Vaughn
Fabian Vancott
215 South State Street, Suite 1200
Salt Lake City, UT 84111
jhardin@fabianvancott.com
svaughn@fabianvancott.com

( )   U.S. Mail, Postage Prepaid
( )   Hand Delivered
( )   Facsimile
( )   Email
(x)   ECF

Colin T. Kemp
Joseph D. Jean
Alexander D. Hardiman
Pillsbury Winthrop Shaw Pittman
Four Embaracadero Center, 22nd Floor
San Francisco, CA 94111
Colin.kemp@pillsburylaw.com
Joseph.jean@pillsburylaw.com
Alexander.hardiman@pillsburylaw.com

( )   U.S. Mail, Postage Prepaid
( )   Hand Delivered
( )   Facsimile
( )   Email
(x)   ECF

/S/ Heidi  McEwen